WILLOTT ET, PLAINTIFFS, *v.* BEACHWOOD (VILLAGE) ET, DEFENDANTS.

Common Pleas Court, Cuyahoga County.

No. 739842.  Decided July 31, 1961.

*Messrs. Davies, Eshner, Johnson & Miller,* by *Mr. Jules Eshner* and *Mr. Ivan L. Miller,* for plaintiffs.

*Mr. Roland A. Baskin,* special Counsel, and *Mr. Albert M. Heavilin,* director of law, for defendants.

EARL R. HOOVER, J.   This is a suit by home owners living within a certain zoned area in the Municipality of Beachwood, against the Municipality, its building inspector and its engineer, to prevent the construction of a proposed shopping center on an 80-acre tract (hereinafter called "The Tract") situated in that area, and to obtain a declaratory judgment of rights and attorney fees.   There are six purported causes of action, but stripped down, the essence of the suit is as stated.   Plaintiffs rely on two grounds: (1) private restrictions and (2) municipal zoning restrictions.

In 1925, Beachwood's Council adopted a general zoning ordinance (hereinafter called the "1925 Ordinance") in which a large area including plaintiffs' property as well as The Tract, was zoned for single family dwelling purposes.   About 35 years later, in 1960, the Council passed an amending zoning ordinance (hereinafter called "The Amendment") which rezoned The Tract allowing it to be used for a shopping center.   The owners of The Tract (hereinafter called "The Proponents") propose to build a shopping center on it.

First, we shall consider the question of private restrictions. Plaintiffs claim that The Tract is part of a realty development or developments of The Van Sweringen Co.; that, as such, it is subject to that company's private restrictions limiting its use to single family dwelling purposes; that, by the 1925 Ordinance, Beachwood intended to adopt and enforce all of the then private restrictions, thereby making them public zoning restrictions; and that The Amendment violated such adopted restrictions.

Let us assume without deciding, that The Tract was subject to prior Van Sweringen restrictions when the 1925 Ordinance was adopted.   Does it follow that it was the intention

of the 1925 Ordinance to adopt and enforce such private restrictions as a part of Beachwood's zoning law? We do not think so. In support of their position, plaintiffs rely on the following provision in Section 21 of the 1925 Ordinance:

"This ordinance shall not repeal, abrogate or annul, or in any way impair or interfere with any existing provisions of law or ordinances, or any rules or regulations previously adopted or which shall be adopted pursuant to law relating to the use of buildings or premises; *nor* shall this ordinance *interfere with* or *abrogate* or *annul* any easements, covenants, or other agreements between parties; provided, however, that where this ordinance imposes a greater restriction upon the use of buildings or premises or requires larger yards than are imposed or required by such existing provisions of law or ordinance, or by such rules or regulations or by such easements, covenants or agreements, the provisions of this ordinance shall control." (Emphasis ours.)

As to private restrictions, all this really says is that the 1925 Ordinance shall not affect any existing private restrictions and that, if the ordinance imposes a greater restriction than the private restriction, the ordinance shall control. This ordinance does not adopt any existing private restriction as a part of the zoning law. Recognition of existence and respect are not adoption. It would be unthinkable that any municipality at its peril would have to know and enforce all the numberless restrictions in countless private deeds. Certainly, Beachwood took on no such nightmare.

Even if a zoning ordinance does not expressly say that it does not affect valid private restrictions, it does not affect them anyway. *"The Law of Zoning"* (1955) by Metzenbaum (hereinafter cited as "Metzenbaum"), Vol. 2, pages 1108-12; 14 American Jurisprudence (Covenants, etc.), 646, Sec. 299; 58 American Jurisprudence (Zoning), 942, Sec. 4. In 15 Ohio Jurisprudence 2d (Covenants), 103, Sec. 113, it says:

"A municipal zoning ordinance, passed subsequently to the acquisition of title by the present owners of lots, permitting the use of such lots for commercial purposes, is not destructive of the covenants of the deeds of lots providing that they shall be used for the purpose of a private residence only. *A muni-*

*cipality by changing a residence zone to a business zone does not assume to pass upon the present effectiveness of restrictive residential covenants* in the deeds of the property owners in a subdivision in a residence zone, nor does such zoning change bind the court in determining the effectiveness of such covenants.'' (Emphasis ours.)

In 101 C. J. S. (Zoning), 664, Sec. 1, it is said:

"A *gulf of difference* separates a zoning regulation from a covenant restriction; what a covenantor specifically demands of the person to whom he sells his property *has nothing to do* with what the community, through municipal regulation, exacts of every property owner.'' (Emphasis ours.)

In *"The Law of Zoning and Planning"* (3rd ed., 1960) by Rathkopf (hereinafter cited as "Rathkopf"), Vol. 2, page 74-1, it is said:

"*The validity of a zoning ordinance . . . should be considered independently of the existence of restrictions* upon the land involved arising out of covenants in deeds or restrictions imposed therein or through agreements between private parties.'' (Emphasis ours.)

The same treatise further says at page 74-4:

"It is the duty of an administrative officer charged with the issuance of permits to administer his duties in accordance with the provisions of the zoning ordinance. Consequently, if an application for a permit shows compliance with the requirements of the zoning ordinance and other applicable ordinances, he may *not predicate his denial of the permit upon the existence of more restrictive provisions in a deed or covenant.''* (Emphasis ours.)

In *"The Law of Municipal Corporations"* (3d rev. ed., 1957), by McQuillin (hereinafter cited as "McQuillin"), vol. 8, pages 33-34, Section 25.09, it is said:

"Restrictions under zoning and those under deeds or contracts do not have common purposes. * * * In truth, the erection of a building in violation of neighborhood restrictions is a *matter of no legal concern to the Municipality.''* (Emphasis ours.)

It is clear that a complaint about violating private restrictions is only a private affair with which a municipality is not

concerned. Such a dispute cannot be litigated in this case. In passing The Amendment, Beachwood did not violate any private restrictions. The necessary alleged private wrongdoers have not been made parties to litigate the private contest. As said in 14 American Jurisprudence, 669, Section 345, in discussing who should be made a party when a private restriction is violated:

"The proper party defendant is the person who has violated the restrictive covenant."

Consequently, plaintiffs can base no relief on the first of their two contentions, i. e., private restrictions.

Next, we consider plaintiffs' second alleged ground for relief; namely, municipal zoning restrictions. Plaintiffs contend that the proposed shopping center violates that part of the 1925 Ordinance which zones the area in which The Tract is located, for single family dwellings only. To the defendants' retort that The Amendment rezoned The Tract in 1960 to permit a shopping center, plaintiffs say that the Beachwood Council abused its discretion in passing The Amendment; that The Amendment is therefore invalid; that the 1925 Ordinance's restriction to residential purposes still stands and that the proposed shopping center violates such restriction.

Plaintiffs ask the court to declare invalid The Amendment which rezones The Tract, and its validity is squarely raised.

In a field that has expanded so rapidly as zoning, one might well expect considerable jargon that is overlapping and confusing and multiplied ways of saying the same thing. Reality does not fail expectation. Cases are jammed with expressions like abuse of discretion, unreasonable, arbitrary, capricious, oppressive, discriminatory, confiscatory, equal protection, due process, invalid and unconstitutional. Use and emphasis of these seem to vary from treatise to treatise, chapter to chapter, section to section and opinion writer to opinion writer. There is, we believe, a simple way in which these concepts can be reconciled.

*First.* It is generally recognized that a zoning ordinance, an amendment thereto, a zoning classification and a zoning reclassification (hereinafter called "Enactments") are presumed to be valid. 8 McQuillin, 24-25, Sec. 25.05, 73-74, Sec. 25.34, 212, Sec. 25.93; 58 Am. Jur. 949, Sec. 16.

*Second.* Generally, their validity will be sustained unless it clearly appears that they are invalid, and the burden of proving invalidity is on their assailant. 8 McQuillin, 25, Sec. 25.05, 200, Sec. 25.86, 249, Sec. 25.113.

*Third.* A standard statement is that generally these Enactments will be upheld as valid unless the Council abuses its discretion in passing them. 8 *McQuillin*, 200-01, Sec. 25.87, 212, Sec. 25.93, 245, Sec. 25.110, 249, Sec. 25.113, 253, Sec. 25.115, 261, Sec. 25.120.

*Fourth.* An abuse of discretion is discretion exercised to an end or purpose not justified by and clearly against reason and facts. Bouvier's Law Dictionary and Concise Encyclopedia (8th ed., 1914), vol. 1, page 94, *State, ex rel.* v. *Blake*, 144 Ohio St., 619, 624; *State* v. *Ferranto*, 112 Ohio St., 667, 676, 677; *Sinclair* v. *Sinclair*, 98 Ohio App., 308, 311-312 and *Board of County Commissioners, etc.* v. *Lewis*, 28 Colo., 378, 380. Simply stated, an abuse of discretion is unreasonableness. Since there is validity unless there is abuse of discretion, it follows that there is validity unless there is unreasonableness.

*Fifth.* The idea that if there is unreasonableness, there is an abuse of discretion, and therefore, invalidity, jibes with the many statements that Enactments are valid if reasonable and invalid if unreasonable. *"Zoning Law and Practice"* (2d ed., 1953) by Yokley (hereinafter cited as "Yokley") vol. 1, pages 36, 477, Sections 26, 185; 8 *McQuillin*, 18-20, Section 25.05, 80-81, Section 25.40, 85-86, Section 25.41, 95-96, Section 25.43; 2 *Metzenbaum*, 1363; 101 C. J. S., 805, Section 68, headnote, 835, Section 84.

*Sixth.* Frequent expressions that an Enactment is invalid if it is unreasonable and arbitrary, or unreasonable and capricious, or unreasonable and discriminatory, and the like, are redundant. If an Enactment is arbitrary, capricious, confiscatory *or* discriminatory, we submit it is unreasonable. *State, ex rel. City of St. Louis,* v. *Public Service Comm.*, 329 Mo. 918, syl. 5, 928; *Harris* v. *State Corp. Comm.*, 46 N. M., 352, syl. 3, 360; *Wisconsin Telephone Co.* v. *Public Service Comm.*, 232 Wis., 274, syl. 2, 288; *Thomas* v. *Mills*, 117 Ohio St., 114, 121; *Garman* v. *Myers*, 183 Okla., 141, 142-143. Also see "Seventh," immediately infra.

*Seventh.* This rash of redundancy is most often found when the constitutionality of an Enactment is being discussed. Thus, a statement will be made that if an Enactment is unreasonable or capricious, or unreasonable, arbitrary and discriminatory, it is unconstitutional. Through this maze, *Rathkopf* (vol. 1, page 4-2), gives this helpful guidance:

"The question of constitutionality of local ordinances under state constitutions, both generally and in the relationship of the particular ordinance to the particular property under particular conditions existing at the time of the litigation, is always present, and is, in its latter aspect, the chief ground of zoning litigation. It is, therefore, of utmost importance to analyze the factors upon which a claim of unconstitutionality may be based.

"The constitutionality of an ordinance must be determined by whether it infringes upon the constitutional prohibition against deprivation of property without due process of law or the denial of equal protection of the law. These constitutional prohibitions have been said to be offended by zoning ordinances which are *confiscatory, arbitrary or discriminating, these terms having been used without very great distinction having been made between them. The challenge to the validity of the ordinance is customarily made on the blanket ground that it is unconstitutional in that it is confiscatory, arbitrary, unreasonable and deprives the plaintiff of property without due process of law and denies the plaintiff equal protection of the law.*

"In fact, *an ordinance which is unreasonable in any of these aspects is unconstitutional, the term 'unreasonable' being used generically in the decisions to describe adversely ordinances which are either arbitrary, confiscatory or discriminatory.*" (Emphasis ours.)

Further, this treatise says (pages 4-5 to 4-6):

"The basic words 'confiscatory,' 'arbitrary' and 'discriminatory,' although in some instances overlapping, generally are used to depict different situations. * * * *In any such situation, it is 'unreasonable.' 'Reasonableness' is the test of validity in every situation.*" (Emphasis ours.)

Thus, constitutional questions too are tested in the test tube of reasonableness. See also 1 *Rathkopf*, 9-2.

*Eighth.* Some statements do not say in so many words that reasonableness is the test of validity. They said that the test is whether or not the Enactment has a substantial relation to the police power, i. e., to the public health, safety, morals or general welfare. Thus, in *Curtiss* v. *Cleveland*, 166 Ohio St., 509, syl. 1, the court held that an amendatory zoning ordinance "constitutes a valid exercise of the police power of the municipality, where such ordinance has a substantial relation to the public health, safety, morals or general welfare."

Similarly, in *State, ex rel.* v. *Stenger*, 120 Ohio St., 418, syl. 1, the court held that:

"The provisions of a zoning ordinance * * * where it does not appear that such restrictions have no real or substantial relation to the public health, safety, morals or general welfare, is a valid exercise of the police power and is not violative of either the state or federal constitution."

Same: *Cleveland Trust Co.* v. *Brooklyn,* 92 Ohio App., 351, 358. See also 10 Ohio Jurisprudence 2d, 230-31, Section 152. Simply stated, if there is a substantial relation, there is validity; if there is not a substantial relation, there is not validity.

Authorities outside Ohio espouse this same view. *Bolger* v. *Village of Mount Prospect*, 10 Ill. 2d, 596, syl. 1, 599, holds:

"A zoning classification will be upheld if it bears any substantial relation to the public health, safety, comfort, morals and welfare."

101 C. J. S., 704-05, Sec. 16, 708-11, Sec. 16, 836-37, Sec. 85; 8 *McQuillin*, 50, Sec. 25.18, 78-79, Sec. 25.38, 202, Sec. 25.88; 1 *Metzenbaum*, 109.

*Ninth.* Since reasonableness is declared to be the test and since substantial relationship to the police power is also declared to be the test, it follows that reasonableness and such substantial relationship are the same thing—just different ways of expressing the same idea. Things equal to the same thing are equal to each other. The authorities recognize this kinship between such substantial relationship and reasonableness.

In 8 *McQuillin*, 48, Sec. 25.17, it says:

"Without doubt zoning regulations *reasonable* in substance and *reasonably* applied *promote the public safety, health, morals, welfare and prosperity,* and aid in community development.

Accordingly, regulations of this character do not deny an owner due process or equal protection of the law." (Emphasis ours.)

In 8 *McQuillin*, 90, Sec. 25.42, it says:

"A zoning restriction on the use of private property *goes too far* when there is no *reasonable basis* for regarding it as *imposed in the general public interest* or, in other words, when it is clear beyond doubt that it is not imposed in the public interest." (Emphasis ours.)

In 8 *McQuillin*, 97, Sec. 25.43:

"Undoubtedly, where a *public interest* in a particular zoning measure is great and private personal or property interest opposing it is inconsiderable, the measure is *reasonable* and does not constitute a taking without due process or equal protection of the law. On the other hand, where the *public interest* is nonexistent or insignificant and the opposing private interest will suffer great injury, the zoning measure is *unreasonable* and hence is violative of due process and equal protection guaranties." (Emphasis ours.)

In 8 *McQuillin*, 106, Sec. 25.46:

"A *balancing* of public interest in zoning as against private interests in property adversely affected, *to determine the reasonableness* of zoning and its constitutionality and validity, must be done in each case * * *." (Emphasis ours.)

In 8 *McQuillin*, 306, Sec. 25.133, it says:

"No vested property or contractual rights can exist against a reclassification or redetermination of permissible or prohibited uses within a use district, where the reclassification or redetermination constitutes a *proper exercise of the police power*, as it does *when it is reasonably related to the public health, safety, morals or welfare*." (Emphasis ours.)

Sometimes the statement is made that the test of validity of an Enactment is whether it is "clearly unreasonable, *having no* substantial relation to the public health, safety, morals or general welfare." We submit that this is just another way of saying that the test is whether it is clearly unreasonable *"because it has no"* substantial relation to the police power. (Emphasis ours.)

This makes sense. The only justification for intermeddling is the police power. When intermeddling stays within the

police power, there is reason for it—it is reasonable! When intermeddling goes beyond the police power, there is no reason for it—it is unreasonable!

*Tenth.* In a factional zoning fight, the court's power is extremely limited. There is a popular misconception about it. Irked citizens often think that a court can upset council's action merely because there are good talking points against it. Nothing is farther from the truth. The court cannot usurp. The functions of court and council are distinct and mutually exclusive. Just because a court is a court does not give it the power to de-enact anymore than to enact a zoning ordinance. Council represents the people. When it speaks, presumably it is the will of the people. A judge cannot override this will of the people merely because he may personally think council's action is unwise, or because he would have voted otherwise if he were a councilman.

The only and limited question that the court can determine is whether the reasonableness of council's action is *fairly debatable*. If it is fairly debatable, then it is valid and a court cannot interfere. If it is not fairly debatable, then a court will declare it invalid. 3 *Metzenbaum*, 1826-42, reviews many cases, but the essence is distilled at page 1826:

"Courts will not measure their judgment over against that of the legislative branch, as to expediency, advisability or wisdom of 'Police Power' legislation, unless there is plainly and palpably no relation between the legislation—on the one hand—and the public welfare, on the other hand. The illegality must be plain, apparent and *beyond debate*, before courts are justified in declaring 'police power' legislation to be invalid or unconstitutional." (Emphasis ours.)

Vol. 101 C. J. S. contains numerous statements on the "fairly debatable" rule (1116, Sec. 323, 118, Sec. 323, 1124, Sec. 325, 1125-26, Sec. 326). At 711, Section 16, it states:

"Where reasonable minds differ as to whether a zoning law, ordinance, or regulation has a substantial relation to the public health, morals, safety, or general welfare, it must stand as a valid exercise of the police power." (Emphasis ours.)

In 8 *McQuillin*, 694, 696, Section 25.281, it says:

"In cases of doubtful or *debatable* reasonableness or

validity, courts will and must sustain zoning ordinances and administrative action thereunder. * * * Where the relationship of zoning to the public health, safety, morals, welfare or other object of the police power is *fairly debatable*, ordinarily the courts will not interfere therewith. That is to say, if reasonable minds differ as to whether a zoning restriction has a substantial relation to one of these fundamental purposes of the police power and of zoning, the restriction must stand as a valid exercise of the police power.'' (Emphasis ours.)

In 8 *McQuillin*, 248-49, Sec. 25.113, it is said:

''A change of residentially zoned land to a commercial district may be reasonable or at least *reasonably debatable* and, hence, valid * * *.'' (Emphasis ours.)

Accordingly, the court must determine whether reasonableness here is or is not fairly debatable. Skilled counsel have raised their rapiers in effective thrust, parry and counterthrust. Among other things, the battle raged on such things as need for a shopping center at all, need for one at this location, preferability of another location, change of conditions, effect on value of neighborhood property, spot zoning, adequacy of drainage, traffic accommodation, safety, annoyance (sights, lights, litter, noise, traffic, people), shielding, etc., etc. There was voluminous testimony pro and con, and con and pro. One can draw up two columns—assets and liabilities—and burst the seams of each. In our mind, the contest is fairly debatable —not with hot air, but hot facts. To discuss all phases would serve only this opinion's longevity; however, a few should be singled out and emphasized.

*First.* Since the original 1925 Ordinance, there has been a tremendous change in Beachwood—the population explosion detonated there as elsewhere. In 1960, there were about 12 times more people than in 1940—a zooming from about 500 to about 6,000—from small village to city status. The city claims that this has caused a need for the proposed facility at this very location, more or less in the conveniently-accessible center of the city, there being none near. There is evidence to support this claim. Expanding population and servicing it are factors that a council may consider. A latitudinal discretion is permitted. In 1 *Rathkopf*, 26-19, it is said:

"Evidence of sufficient change in the character of or conditions affecting an area to warrant a reclassification of property therein could be found in the *need, caused by expanding population* * * * for shopping centers * * *." (Emphasis ours.)

In *Skinner* v. *Reed*, 265 S. W. 2d (Tex. C. A.), 850, syl. 1, it is said:

"Where property consisting principally of pasture and farms and supporting only a few residences was zoned for two family residences, evidence that hundreds of homes had been built in the area during the course of several years subsequent to zoning ordinance and the closest large shopping center was about nine blocks away, was sufficient to justify amendatory ordinance changing classification to permit local retail establishments."

In *Bartram* v. *Zoning Comm.*, 136 Conn., 89, 92, where the court upheld a reclassification from residence to business zone, one of the factors was that "there is no shopping center within a mile of it." In *Tarasovic* v. *Zoning Comm.*, 147 Conn., 65, where the court upheld a rezoning from residence to commercial uses to permit a shopping center, one of the factors emphasized was:

"There has been a rapid increase in population in the town during the past seven years. * * * enlargement of the business zone is consistent with the growth of population, which has brought with it increased demands for services and a corresponding need for more business accommodations."

In *Eckes* v. *Board*, 209 Md., 432, 441, where a rezoning from residential to commercial uses to permit a shopping center was upheld, even though there were two other areas, zoned commercial, within 575 feet and 2,500 feet which had not been developed, one fact emphasized was:

"* * * on account of the large number of group houses and row houses already erected and being erected in the vicinity * * * there is a definite need for the establishment of a shopping center at this location."

In *Levinsky* v. *Zoning Comm.*, 144 Conn., 117, 125-126, a rezoning to permit a shopping center was upheld even though there were "two large food stores and a shopping center close by," the court saying:

"The zoning authority is endowed with a wide and liberal discretion. * * * The circumstances and conditions in matters of zone changes and regulations are peculiarly within the knowledge of the zoning commission. Where it appears that an honest judgment has been reasonably and fairly exercised after a full hearing, courts should be cautious about disturbing the decision of the local authority."

In *Raymond* v. *Comm'rs.*, 333 Mass., 410, 412, the court upheld a rezoning from residential to industrial use, saying:

"The fact that there was other land in the city available for manufacturing did not mean that the subject area had to be kept in a residential classification."

In 101 C. J. S., 831, Sec. 81, it is said:

"* * * the zoning authority * * * notwithstanding it has enacted zoning ordinances, ordinarily is not precluded from changing the regulations in the future where the growth and progress of the municipality require it, or where it is for the general welfare of the municipality."

In 8 *McQuillin*, it is said:

"The establishment of business districts is within the discretion of the municial legislative body, and courts will interfere therewith only in case of clear abuse." (Page 245, Sec. 25.110.)

"* * *

"Under comprehensive zoning laws shopping and business centers at convenient locations in residential districts generally are permitted. They do not constitute invalid 'spot' or 'island' zoning where their existence, location and extent are reasonable." (Pages 250-51, Sec. 25.115.)

"* * *

"It is within the discretion of a municipal legislative body to determine the boundaries of shopping or business centers in residential districts and to determine whether a business center in a residential district should be enlarged; courts will not interfere with the exercise of such discretion except for clear abuse." (Page 253.)

*Second.* Since the original 1925 Ordinance, there has been a tremendous change in shopping habits. This point was forcefully stated in *Pressman* v. *Baltimore*, 222 Md., 330, 338-39,

where the court, in upholding a rezoning from residential to commercial use to permit a shopping center, said:

"This case illustrates * * * that shopping centers were not thought of when zoning regulations were first adopted * * * The shopping and motoring habits of people are quite different today from what they were in 1931. Popular desire or need for large shopping areas and the necessity of adequate off-street parking facilities in connection therewith now seem to be generally recognized. Whether this should be regarded as an error in original zoning or the result of changed conditions may be a matter of a choice of words or of approach. In either event, a contention that the action of the legislative body in rezoning these properties is devoid of support, simply cannot be sustained."

Likewise, in *Clark v. Town Council*, 145 Conn., 476, 482, 483, 487, 488-89, a change in zoning to permit a regional shopping center was upheld, the court saying:

"It is axiomatic that all private property is held subject to the police power * * * When the issue whether the zoning legislation does serve the public welfare is fairly debatable, courts cannot place their judgment above that of the legislative body. The limit of the exercise of the police power is necessarily flexible. We must consider the constitutional validity of the present zoning legislation in the light of the development of the modern metropolitan area, with its growing population, its heavy traffic and the purchasing habits of its people. * * * between 1930 and 1950 the town nearly doubled in population. * * * With this growth of the town and the change in traffic and in the shopping habits of the people, the zoning authorities gradually eliminated the smaller business districts, which had not been used, and developed larger business districts with off-street parking. * * * This enlargement * * * (for business) was consistent with the modern policy of establishing business zones to accommodate a variety of commercial enterprises patronized by the public and to provide adequate parking off the highway."

In 8 *McQuillin*, 56, Sec. 25.20, it is said:

"Circumstances may so change in time . . . as to clothe with a public interest what at other times . . . would be a matter of purely private interest."

In 8 *McQuillin*, 145, Sec. 25.65, it is said:

"Clearly a municipality vested with the power to comprehensively zone its area must have power to amend its zoning ordinances from time to time where there are substantial changes of conditions, which inevitably occur, and where the amendment has some reasonable relation to the end sought to be obtained, viz., furtherance of the public interest. The reason is that zoning is not static, but it changes with changed conditions and the complexities of the modern age. If the rule were otherwise, there would be no progress."

In "Beachwood Park," as the project is called, Proponents propose to establish a large, beautiful, mall-type, integral, high-class, regional shopping center with a variety and quality of merchandise not now available. This is not just another shopping center. As plaintiffs' own exhibit (No. 8) shows, it is:

"* * * designed to be a handsome addition to the community, its appearance suggesting a campus or park rather than a conventional shopping center. To achieve this appearance, the following factors have been incorporated in the design—factors which make Beachwood Park uniquely attractive to the high-grade community which it will serve:

1. A planting belt of at least sixty feet total depth separates Beachwood Park from all surrounding roads, and islands of large existing trees are preserved and beautified as green shady areas throughout the project.

2. Signs at the entrances to Beachwood Park are small and dignified, park-like in design. The usual flashing neon signs are not considered as part of the visible exterior views of this development. They will be replaced by coordinated-design vertical markers at each pedestrian entrance to the Mall.

3. Buildings, set back at a great distance from all roads, are designed to be low and harmonious with the residential architecture of the neighborhood, being of red brick and white trim, of small size and domestic scale, and surrounded by green terraces, lawns, and planting."

Such a unique facility of a type demanded by a people's changed shopping habits is a factor that council could properly weigh in making its decision.

*Third.* There has been a tremendous change in the vicinity

of The Tract. The Court visited it with counsel, and with their permission revisited it. Even now, giant road machinery is frantically tearing up the land on the eastern edge of The Tract, clearing way for the new North-South freeway which will border or encroach upon that edge. This 400 feet wide, four-lane, nonresidential, bustling strip, bombarding the site with a steady stream of traffic, day and night, local and long distance, county and state, national and international, is bound to shatter much of the seemingly cloistered aura of the area. Council could properly consider this factor in deciding to rezone The Tract. As is said in *Soule v. Town of Perinton*, 152 N. Y. S. 2d, 734, 737:

"The whole impact of the Thruway on this section of the town might well have stimulated the action of the Board."

*Fourth.* The set-up is peculiarly unique. Plaintiffs contend that, in rezoning The Tract, council thrust a commercial dagger into the very heart of a fine residential district. In reality, this is not so. Essentially, the battle arena is a residential area on paper only. Not a house exists upon The Tract. Not a soul lives there. Not a house abuts upon it. It is a wilderness that would fit well in some far-off tanglewood. Stand anywhere on any of its borders and look as far as you can see. What is the big surprise? The visible terrain is not filled with houses. It is filled with an almost complete absence of houses. The Tract is an island of vacancy surrounded by a sea of vacancy. The very few, sparcely-placed houses on the horizon are fairly well shielded from The Tract by distance and topography. They will be even more protected by the ingenious, detailed, built-in screening devices of the project. The fact that the surrounding area is undeveloped and that the disputed property is segregated from existing houses are factors that council may consider. *Partain v. City of Brooklyn*, 101 Ohio App., 279, 283; *Barry v. Town of Glenville*, 192 N. Y. S. 2d, 845, 846; *Birdsey v. Wesleyan College*, 211 Ga., 583, 590; *Bartram v. Zoning Comm.*, 136 Conn., 89, 93 ("practically only one house, adjacent to this tract on the north, which would be directly affected").

*Fifth.* There was evidence that the project would be a great boon to Beachwood in supplying a much-needed increase in tax yield. In Ohio law, we have found no authoritative pro-

nouncement on the effect of this as a factor. Elsewhere the rule seems to be that this is not, of itself, sufficient to sustain a change in zoning. 101 C. J. S., 848, Sec. 92; 1 *Rathkopf*, 10-5. Compare *Rodgers* v. *Village of Tarrytown*, 302 N. Y., 115, 122; *Shaker Coventry Corp.* v. *Shaker Heights Planning Comm.*, 86 Ohio Law Abs., 47, 53. Under our analysis, it is not necessary to decide this question. The other factors are so decisive in sustaining council's action, that we have come to our conclusion without using tax yield as any basis for such justification. Where other factors sustain council, the fact that the city may benefit tax-wise is of no consequence.

*Sixth.* There is evidence that the project will increase the value of other property in the area; there is also evidence that it will decrease it. Assuming that it will depreciate the property of some citizens, that cannot invalidate the action of council where it is exercised, as here, within the spacious gamut of the police power. In 101 C. J. S., 849, Sec. 94, it is said:

"* * * the zoning authority is not deprived of power to make a proper change, nor should it refuse to make it, by the fact that the change may be detrimental to, and opposed by, numerous property owners and residents of the area, where the change is for the general welfare of the municipality."

8 *McQuillin*, 98-99, Sec. 25.44; *Curtiss* v. *City of Cleveland*, 166 Ohio St., 509, syl. 2.

In conclusion, may we say that this was no rash, rush job, but one carefully considered over a considerable period. No tyrant thrust it upon the community. The people themselves adopted it through dramatic, democratic processes. If council's action did not represent the peoples' will, they could have repudiated council by referendum. None was sought. Council had discretion. Discretion implies the absence of a hard and fast rule. Such a rule would be the end of discretion. Discretion implies choice. Council had a choice. It was acting within a band of the police power where it could have said "yes" or "no." Council is close to the situation—much closer than a court can be. The details of a local matter are peculiarly within its knowledge and feel. That's why it is so wise that courts do not interfere when the reasonableness of council's action is fairly debatable. That's why this court cannot interfere here.