Willott et, Plaintiffs-Appellants, *v.* Beachwood (Village) et, Defendants-Appellees.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25924.  Decided March 7, 1963.

354

*Messrs. Davies, Eshner, Johnson & Miller,* for plaintiffs-appellants.

*Mr. Roland A. Baskin,* for defendants-appellees.

SKEEL, P. J. This appeal comes to this court on questions of law from a judgment entered for the defendants in the Court of Common Pleas of Cuyahoga County after trial of the issues to the court. The action is one seeking "Injunction, Declaratory Judgment, Attorney Fees and Equitable Relief."

The principal relief which the plaintiffs seek is a declaratory judgment holding that an amendment to the zoning ordinance of the Village of Beachwood passed by the Village Council effective June 6, 1960, whereby the zoning restrictions on a single tract of eighty acres situated between the eastbound roadway of Shaker Boulevard and South Woodland Road and running from the east side of Richmond Road to the easterly border of the Village, was changed from U-1 (wide lot single-

family residence district) to U-4B (for shopping center purposes) to be void and of no legal effect.

The development of Shaker Heights and the municipalities to the east of Shaker Heights, beginning at Shaker Square and extending east for the most part between Fairmount Boulevard on the north and South Woodland Road on the south (and in some places to the north and south of these two east and westbound principal highways), to the Chagrin River valley, was a real estate development of the Van Sweringen Company. It was and is the largest residential real estate development in the community. The record discloses that the developers, in planning this very extensive real estate project, attempted, by restrictive covenants and other contractual agreements with purchasers, to protect purchasers of lots and home-owners from any use of the property sold for residence purposes from uses other than residential uses and for uses within the class of residence property as originally planned by the Van Sweringen Company. The evidence shows that the property along Shaker Boulevard and South Woodland Road is in the approximate middle of this high class, large lot residential development, and that in support of the restrictions of record, the municipal corporations, Shaker Heights, Beachwood, Pepper Pike and Hunting Valley, by the enactment of zoning ordinances, gave complete support to the restrictive covenants imposed by the Van Sweringen Company. As the property now stands, there have been no deviations from the large lot, single-residence uses, as originally planned by the developer, from Shaker Square to Chagrin River, some six or seven miles, with one or two exceptions. These exceptions are primarily due to existing non conforming uses on Warrensville Center Road near South Woodland Road, existing over the intervening forty years or more from the beginning of this development. The Shaker Heights Zoning Ordinance, which was first passed about December 6, 1927, was revised on a number of occasions up to and including April 1, 1949, as shown by plaintiffs' Exhibit 22, and the zoning restrictions, with the exceptions of the non conforming uses, some two-family houses on Warrensville Center Road near South Woodland Road, and changes at the intersection of Fairmount Road and Warrensville and Fairmount and Green Roads

at the northerly limits of the City of Shaker Heights, have not been altered in any way during this long period of time. Some of the witnesses described this part of the Van Sweringen development, and that to the east of the City of Shaker Heights, as the highest type and most desirable single-family residence community in the county.

The extension of this first class, large lot, single-residence district, through the Village of Beachwood, with like deed restrictions, received protection for the designated restrictive uses of such property by a zoning ordinance passed by the Village Council of Beachwood June 9, 1925. This ordinance, in part, provides:

"Whereas, the Village of Beachwood is a residential suburb of the City of Cleveland, having no steam railroad and no industrial centers; and

"Whereas, the territory adjoining the Village has to a very large extent either been zoned or restricted in such manner as to make such territory largely residential, and

"Whereas the territory of Beachwood is undeveloped and its best and most valuable use is for residential purposes; and

"Whereas it is the desire of the citizens of the Village and the Council thereof to preserve the character of the Village as a residential district; * * *."

This ordinance further provided:

"Section 21: Interpretation. Purpose. (Ordinance No. 70—Passed 6/9/25)

"In interpreting and applying the provisions of this ordinance, they shall be held to be the minimum requirements adopted for the promotion of public health, safety, comfort, convenience and general welfare. The lot or yard area required by this Ordinance for a particular building shall not be diminished and shall not be included as part of the required yard or lot area of any other building. This ordinance shall not repeal, abrogate, or annul, or in any way impair or interfere with any existing provisions of law or ordinances, or any rules or regulations previously adopted or which shall be adopted pursuant to law relating to the use of buildings or premises; nor shall this Ordinance interfere with or abrogate or annul any easements, covenants, or other agreements between parties;

provided, however, that where this Ordinance imposes a greater restriction upon the use of buildings or premises or requires larger yards than are imposed or required by such existing provisions of law or ordinance, or by such rules or regulations or by such easements, covenants or agreements, the provisions of this Ordinance shall control.''

The importance of the preamble and Section 21 of the Beachwod Zoning Ordinance, just quoted, found in the original Zoning Ordinance of 1925, which has been in force without change by any of the amendments to the date of trial, is that during the intervening years as the property along Shaker Boulevard and South Woodland Road and to the south of Fairmount Boulevard within the Village, developed its declared purpose and has been complied with in all respects and without deviation, that is until the amendment here being considered was passed effective June 6, 1960. There is not the slightest suggestion in the record that the high zoning requirements imposed upon property in this district have ever been departed from, and that through this period of time, since the adoption of the zoning ordinance, high class, single-family homes, ranging in value from forty to seventy-five thousand dollars on the current market, have been built until at this time there are very few vacant lots available except where such development in Beachwood has been curtailed by the failure of the proper public authorities to provide sanitary sewers. The absence of sanitary sewers is the basic reason why more than one half of the building lots in Beachwood are still unimproved, it being stated that building permits have been refused for that reason. The vacant land on the west side of Richmond Road in the vicinity of the property zoned under the amendment for a shopping center has been subject to this difficulty, as is shown by the record, it being suggested that this condition is now being or has just been corrected. The Mayor of the Village testified:

''Up until this time there has been no place to put the sewage after you collected it in the village and there never has been a trunk down to a treatment plant, but now the Cedar-Richmond trunk sewer is soon to be upon us. To the best of my understanding it will be there this next spring. The trunk sewers across Richmond Road and across, roughly, the easterly

village line will then open up this presently undeveloped land to sanitary sewers and we have been—council, I say, believe for what happened over the years with the people that owned this land, that at such time the sanitary sewers are available, they will seek to sub-divide their large parcels and open it up for development.''

The Zoning Ordinance of Beachwood was amended in 1956 by which amendment a use classification of U-4B (Shopping Center) was, for the first time, provided.

The amended ordinance sets out the conditions to be imposed in building a shopping center. Section 32.01 provides:

''This zone is established in order to provide regulations for area requiring large amounts of land and involving uses generating large volumes of traffic and serving the shopping needs of a large area. General retail business, shops and offices providing services will be permitted in this area except for those uses which are prohibited and designated as Class U-6 Uses in this ordinance.'' (Class U-6 defines prohibited uses.)

Section 32.02 provides:

''Area Yard and Height Regulations''

''1. A shopping center in this district shall be designed and developed as a unified and well organized arrangement of buildings and services. Vehicular traffic shall be separated from the principal pedestrian movements other than to and from parking areas. Delivery facilities shall be located so as not to interfere with the movements of pedestrians and vehicles.

''2. The ground area occupied by Buildings shall not exceed 20% of the total area of the lot. At least 15% of the total area of the lot shall be developed as planted area.

''3. All buildings shall be set back from any public street or highway at least 300 ft. except that the yard may be developed for parking facilities to within a minimum of 30 ft. of a street line.

''4. Side or rear yards where adjoining a residential district * * * shall be at least 300 ft. except that such yards may be developed for parking * * * to within 50 ft. of a residential district line. Screening or planting for the protection of adjacent properties as determined by the Planning and Zoning

Commission shall be required along property, residence district and street lines.''

Paragraph 5 deals with the heights of buildings which are not to be more than two stories high except that not more than 30% of the ground floor area of the shopping center may have a height not exceeding 35 feet.

The Planning and Zoning Commission is authorized to grant exceptions to any of the foregoing requirements so long as the ''spirit and intent of the ordinance is not violated.'' These requirements fall far short of the mall type shopping center depicted in the defendants' brochure of ''Beachwood Park'' used to induce the Village Council to reduce the zoning classification of the eighty acre tract.

After the amendment of the Zoning Ordinance of Beachwood, passed in 1956 to provide for a U-4B (Shopping Center) use, a ninety-seven acre parcel under the same proprietorship as the eighty acre parcel was zoned for U-4B uses. There were no deed restrictions of record on this land, it was completely vacant and the territory about it for the most part was sparsely settled, its location being at the intersection of Richmond Road and Cedar Road in the extreme northeast corner of the Village. The Acacia Country Club is located at the northeast corner of this intersection. This ninety-seven acre parcel is located just one and six tenths miles north of the eighty acre parcel as is disclosed by the record and is much closer to the place of residence of the great majority of the people of Beachwood than is the eighty acre parcel, and as a regional shopping center, will serve the same territory outside of the Village.

Prior to the amendment of the Zoning Ordinance, whereby the eighty acre parcel between Shaker Boulevard and South Woodland Road on the east side of Richmond Road was zoned U-4B (for Shopping Center purposes), the proprietors thereof published and presented to the Planning Commission and Councilmen of the Village a brochure depicting in detail what is called ''Beachwood Park'' said to be a mall type regional shopping center.

The request to change the zoning of this tract of land from high-class, large lot residence purposes to shopping center purposes was presented to the Planning and Zoning Commission

on March 31, 1960. The minutes of this meeting are, in part, as follows:

"Mr. Dominic Visconsi (one of the proprietors of the eighty acre tract) appeared to discuss the proposal for a shopping center at the intersection of State Routes 87 and 175. Printed brochures describing the proposals for the development were furnished the members of the Commission as had been previously requested. The basic request of the proposal is for the rezoning of the property (the 80 acre parcel) from Class A-1 Single Family Residential Use to Class U-4B district Shopping Center Use. After his presentation a general discussion was held among the Commission, the public and Mr. Visconsi on the proposed rezoning request."

After the discussion, the law director was directed to present proper legislation to rezone the eighty acre parcel. Whereupon on April 28, 1960, the Commission recommended passage of the proposed ordinance and on the 28th day of April 1960, the Village Council passed the amendment, the ordinance, in part, providing:

"Whereas, the Council deems that the aforesaid Zoning change in the hereinafter described property should be made and the same is conducive to the public health, safety, convenience, prosperity and the general welfare of the community."

The ordinance then declares that said single parcel, describing it, shall be zoned U-4B use district (shopping center).

From the judgment of the court, entered for the defendants and dismissing plaintiffs' petition, the plaintiffs claim that the amendment to Zoning Ordinance 70, rezoning the eighty acre parcel located on the east side of Richmond Road extending between Shaker Boulevard on the north and South Woodland Road on the south to the eastern border of the village from single-residence, private family residence, to a regional shopping center constituted an abuse of discretion on the part of the Village Council and therefore such ordinance is illegal and void.

There are other claims of error but they come within the framework of the claim of error as thus stated except perhaps that amending the zoning ordinance of a single parcel of eighty acres situated in the very heart of an extended area zoned and used exclusively and without change as a highly restricted,

large lot single-family residence area to be used for a regional shopping center, constitutes spot zoning.

The evidence, as has been indicated, is not in dispute but that there has been no change or departure from the original residential character of all of the territory surrounding the eighty acre parcel between South Woodland Road and Fairmount Boulevard and to the east and west thereof. The plan of providing so-called screening for the high-class restricted residential property, as it was originally developed, was accomplished by zoning the surrounding property for single residences to be constructed on lots more moderately restricted and of smaller size, followed by two-family uses, multi-family and apartment house uses, and finally providing for retail and commercial uses along the north and south perimeters of the City of Shaker Heights, the Villages of Beachwood, and Pepper Pike, which plan has been followed without exception. However, as indicated, the highest class, single-family, large lot residential area, as described, continues without change with Shaker Boulevard running east and west as the proximate center of such residential area through the City of Shaker Heights, the Village of Beachwood, and the Village of Pepper Pike for a distance of more than eight miles except that in Pepper Pike the smallest building lot must consist of at least an acre of ground. The evidence discloses that the development of this large lot, single-family residence area was improved by the many owners in reliance, in part, on zoning restrictions enacted by the Council of the Village of Beachwood and as sanitary sewers were provided, the building of high-class residences has continued in the area to the date of the filing of this record.

The record shows, as indicated, that six or perhaps seven shopping centers have been developed in the appropriate zoned areas, that they are within reasonable distance of all the inhabitants of the village, and that regional shopping centers, in which one or more sizable department stores are located, are also located nearby, one within three miles of the intersection of Richmond Road and Shaker Boulevard. It is also undisputed that the ninety seven acre parcel at the corner of Richmond Road and Cedar Road (zoned for shopping center purposes) is closer to more of the residents of Beachwood than

the eighty acre parcel. The defendants' shopping center expert testified:

"The two centers cover in general the same general trade area but the one at Shaker Boulevard is the one the stores designated for this center (meaning department stores) will take because it has better accessibility and it will draw from the very heart of the high income group."

This witness said that the accessibility to the eighty acre tract would require extensive road improvements. He also stated, in a report of his survey of the Cedar Road property made for the owners, the following:

"Our market survey of your Beachwood Mall Shopping Center site at Cedar and Richmond Roads in the Cleveland Metropolitan Area shows that it will draw customers from a trade area with 148,000 families in October, 1960, of which 108,000 families live in the ten minute driving time zone in Cuyahoga County and in Lake County. The families in the entire trade area have an aggregate income of $1,341,000,000, or over $9,000 per family.

"This trade area is growing with exceptional rapidity, the population of the close-in trade area having jumped from 280,-000 in 1950 to 380,000 in 1955, and is expected to increase to 472,000 by 1960, and to 577,000 by 1965.

"We estimate that the Beachwood Mall Shopping Center will have aggregate sales of $50,600,000 in 1960, including sales of $20,000,000 at department stores, $12,000,000 in apparel and variety stores, $10,000,000 in super markets and $1,500,000 in drugstore sales."

The evidence shows that the estimated income for the eighty acres, if improved as a shopping center, would parallel that of the Cedar Road-Richmond Road parcel. So far as retail sales are concerned, there would be no advantage of one over the other. The figures make it abundantly clear that this proposed regional shopping center at the intersection of Shaker Boulevard and Richmond Road is in no way concerned with the health, welfare and safety of the people of the Village of Beachwood but is a business venture attempting to attract thousands of customers from a part of two counties which will be necessary to support its operation.

The defendants' witnesses are in agreement that the already overtaxed highways at the peak hours of traffic on Richmond Road, Shaker Boulevard and South Woodland Road, which are the highways providing ingress and egress to the proposed regional shopping center, will be even more congested and overtaxed when the shopping center is open for business. The traffic count in 1958 at the intersection of Shaker Boulevard and Richmond Road between 7 A. M. to 7 P. M. was 25,000 automobiles and at Richmond Road and South Woodland Road, the traffic count was 19,000 automobiles during the same period. This count must be considered as indicating there has been a sizable increase in traffic during the intervening years. The defendants' evidence foresees that 10,000 families will be attracted to this shopping center and that by 1970, 14,000 automobiles will come to the center each day. It is said that parking spaces will be provided for 4300 automobiles. Both the shopping center expert and the representatives of the Regional Planning Commission testified that it would be absolutely necessary to improve the highways upon which the shopping center faces to accommodate the additional traffic before the shopping center could be successfully operated. The improvement suggested would require a rebuilding of the bridge on Richmond Road over the Shaker Rapid Transit right of way, estimated to cost $350,000.00, the rebuilding of the vehicular part of the right of way of Richmond Road from the existing 16 foot pavement to a four lane highway, and the building of a new roadway along a proposed extension of the Rapid Transit tracks. It was also proposed by one of the defendants' witnesses that some type of entrance and exit facility could be built to the new North-South Freeway which skirts the southeast corner of the eighty acre parcel, a suggestion which borders on the realm of fantasy. The only exits provided by the freeway are at Mayfield Road and Cedar Road and Chagrin Boulevard. The direct use of the freeway was a basic fact assumed by two of defendants' experts in supporting their conclusions that the eighty acre parcel is suited for regional shopping center purposes. On this general subject defendants' witness from the Regional Planning Commission testified as follows:

"Q. Well, how many people per day would be required to support a center like that?

"A. The word required is the problem. See, I am not necessarily a market analyst in terms of telling the people in this shopping center how many customers they need to succeed in business. My aspect is to determine whether this shopping facility can be a compatible use for this piece of land in relationship to the general community, whether it can be economically supported in a general way, so it doesn't turn into a problem for this community, so that if it cannot be rented the village is not faced with changes of use and whether the highway system is adequate or can be made adequate to bring people in and out of the shopping center.

"Q. Then, you would say, Mr. Roebuck, that if this proposed shopping center would face such complication, so it could not be entirely rented, it would create problems for the community?

"A. Yes.

"Q. It would tend towards a general depreciation, would it not?

"A. It might very well.

"Q. Now, how many cars per day would be using this shopping center, if it were put into operation?

"A. That I can answer. We estimated by 1970 there would be 14,000 cars.

"Q. 14,000 cars per day?

"A. Yes.

"Q. And before—

"THE COURT: 14,000 using the facility every day or what?

"MR. ESHNER: Yes, that is what I understood.

"THE WITNESS: Yes, cars."

If an improvement of the highways, as suggested, is an absolute necessity to the use of the eighty acres as a regional shopping center, such improvements could not be accomplished by the Village. It has neither the financial ability nor legal right to do the things said to be absolutely necessary. Richmond Road is a county road and the improvements suggested would have to extend beyond the boundary of the Village. Direct access from private property to the freeway is impossible, the closest interchange being at Cedar Road about two miles north and east and Chagrin Road over a mile south and east.

Without attempting to stress beyond the sphere of its importance the effect which a reduction of the use classification of the eighty acre parcel might have on the traffic problems in that neighborhood (*State, ex rel. Killeen Realty Co.* v. *City of East Cleveland,* 169 Ohio St., 375, 160 N. E. (2d), 1), yet where the defendants' witnesses testify that the enterprise (regional shopping center) for which the property may then be used cannot be successfully operated for such purpose unless and until public expenditures of a considerable amount have been made to make the new use practical, such fact is certainly one to be considered in determining whether or not the legislative authority has abused its discretion in reducing such zoning classification as was accomplished by the amendment.

The testimony of defendants' witness, together with other evidence received, clearly establishes that as of the present time, the community of Beachwood is adequately covered with local shopping centers. The planning expert testified as follows:

"A. In terms of local shopping needs, we indicate Cedar-Green Shopping area will serve this portion of Beachwood (indicating).

"The northerly portion of Beachwood, Fairmount Boulevard. That doesn't mean after 1970. You see—I will go back.

"Ultimately the Village of Beachwood will have 5,000 families, if all the lots which are now zoned for residences are developed with residences. We project this to say that by 1970, possibly, 3500 of these lots will be developed; so you realize I am dealing with 3500 and not 5000, and this is true of communities to the east, which will develop much slower. So the local facilities at Cedar-Green and if local shopping were to be developed on Chagrin Boulevard, as it is now zoned, it has not been developed, plus Woodmere, we would say this was adequately covering local shopping.

"May I say the Woodmere Shopping Center is something over which we have no control and we would much prefer that shopping center not to be located over there for many reasons, but it is there and that is a fact we have to deal with it, but for local shopping it would satisfy.

"Now, local shopping is a general term. It means the place

you go to for supermarkets and shopping where you may buy small items of apparel, where you will go to a chain variety, but you would not go to local shopping for furniture, never buy a suit of clothes and more than likely women would not buy dresses.

"Perhaps the best way of showing the difference is that in a local shopping center you would have one store of each type, so you would not be able to compare items, but in a larger center, as you go up the grade towards the largest one, which is regional, that is a comparison center. You would have many stores where you could compare items, shoes, furniture, appliances. A department store would not appear until you reach the regional level.

"So you have to be sure of the sizes you are talking about. Regional shopping centers, normally, start at about 400,000 square feet store area. Local centers rarely go beyond 120,000 or 130,000 square feet area."

At the time this testimony was given the Severance Regional Shopping Center was not, as it is now, a reality. Such shopping center, one of the largest in the community, is less than five miles away from the eighty acre tract.

The Mayor of the Village testified:

"I for one feel that a high quality shopping center would have the same influence on Beachwood Village and surrounding neighbors as Shaker Square has had on its immediate area. I feel that a high quality shopping center would have a stabilizing influence. It would give the people in the neighborhood an outlet for satisfying all their material needs and they would be more inclined to stay put and rather than have a transient population, we would have an established population.

"The area served, by where the land is located, in my opinion, is ideally suited for a high quality shopping center due to the axis roads, Shaker Boulevard coming both from the heart of Shaker Heights with a high economic population, the north and south roads, the State Route 175 and State Route 1, the proposed North-South Freeway, will, I feel—

"* * *

"A. I feel, as I said before, there is a real need for the immediate residents of the Village of Beachwood and for the immediate neighbors of Beachwood for a place *where the people,*

*who desire to buy some of the finer things of life, can purchase them without having to go to downtown Cleveland or to New York or Chicago or other cities.* They will have the stores of supply convenient.

"The road pattern, in my opinion, is the most convenient location in the Village to locate this type of center.

"Now, as far as that is, my opinion as to the need of a shopping center as it concerns the residents, as it concerns the village administration, *I feel the revenue to be generated by a shopping center at this location would do much to solve our financial problems*, both in the municipal end, which supplies the everyday housekeeping services and—(Emphasis added)

"*  *  *

"A.—and also on behalf of the Board of Education, which gets its real money from the real estate duplicate.

"*The fact that a shopping center on this site would increase the duplicate without generating one school child is of great concern.* The school costs are increasing steadily. A single family residence can be assumed, in my opinion, at least usually produces—." (Emphasis added.)

The claim that one of the dominant motivating factors in seeking the zoning change of the single eighty acre tract to a shopping center use was the effect that a regional shopping center, if built, would have on the financial structure of the Village is clearly supported by the evidence. The Mayor testified that the present duplicate of the Village is $30,090,000.00, that the center would add five million dollars to the duplicate of the Village, that this would increase the amount received from real property tax of about $160,000.00 for the schools and $20,000.00 for the Village. This witness went into the financial plight of the municipality, calling attention to the instances where new equipment was needed and stated the fact to be that when the Village assumed its status as a City, a notice of which had already been received from the State, some duties now performed by the county would become the obligation of the municipal corporation as a City. Other witnesses for the defendant stressed the advantage to be experienced by the increase of the tax duplicate resulting from the building of a regional shopping center. Under the facts of this case, no

368

consideration should have been given to the effect that the building of a shopping center would have on the financial status of the Village. Zoning classifications must be based on the protection of the health, safety and welfare of the people and not as a means of financing village activities. It is an exercise of the police power of the state. Such power cannot be used to give economic advantage to the village and to the owner of a single parcel of land over that of the surrounding landowners except when the public safety, health or morals require it.

It is claimed that the introduction of a commercial enterprise into the heart of a highly restricted residential area will cause damage to and reduce the value of the surrounding properties. The evidence in the record on this question is in some conflict. Some of the Village officials whose properties were one half mile or more away from the eighty acre parcel testified only as to the effect the zoning change would have as to their properties. Such evidence was of no probative value as to the property surrounding that of the eighty acre parcel subject to the change in zoning. The subject of value is generally considered as to the effect of the refusal to reduce the classification of property in an existing zoning ordinance or including property in a class higher than that for which it is said to be best suited. However, the defendants' expert witness on city planning, in describing the availability of the eighty acre tract for a shopping center, said:

"*** * * As you can see by examining it, it is bounded by four roadways, the projected State Route 1 on the east, on the north is Shaker Boulevard, which is a divided roadway, on the west is Richmond Road, State Route 175, which has, I am sure, 100 foot of right-of-way, which means it can be widened sufficiently to take care of future traffic, and on the south is South Woodland, which is a very wide roadway, too. These are all roadways which are county-wide. They connect with a county-wide system. None of these are local streets, which would be the kind of street which certainly would be a poor street to serve a large shopping facility.

"Also from the pattern of development, it was fairly well isolated from other land uses and particularly Beachwood is

essentially a residential community, which would be opposed to bringing in a land use. This is one of the words we planners fill out, the land use.

"May I backtrack a little? At some point the planning commission had considered rezoning further north and at that point we were opposed to it for the very reason we thought it would upset the residential pattern of Beachwood and we were very anxious for it to go at the present location, knowing the land use. There is very little residential development immediately next to it. In fact, you have very little development. *You have the buffer there and to the south there is no development at the moment,* the south side of South Woodland and there is very little on the east or west of Richmond Road." (Emphasis added.)

The "buffer" is land zoned for high class, large lot, single-family residence purposes suitable and desirable for the purpose zoned. One of the basic circumstances which justifies the exercise of the police power in passing zoning ordinances is the necessity of separating industrial and commercial uses from areas zoned for residence purposes. Such separation of uses is in the interest of the safety, health, morals and well being of the people. The rezoning of a single parcel for shopping center purposes in the center of a neighborhood which has been classified for high class residence purposes for a long period of time without change and has been thus substantially developed, would add tremendously to the value of the rezoned parcel. Consequently, the property surrounding it, still bound by the high restrictions, would be considerably diminished in value. The witness's testimony, just quoted, to the effect that the vacant land to the west is a buffer zone must have been intended to contradict the plaintiffs' contention that their properties would decrease in value should the shopping center be built. But the land said to constitute the buffer zone, clearly by this evidence admitted to be damaged, is also entitled to the protection of the law. It is clearly shown by the record that once a commercial zone is created in a residential area, it tends to expand because the surrounding land is no longer available or desirable for residence uses. The legislative power of a municipality has no legal right to grant an economic privilege to one land-

owner over and to the detriment of his neighbors without basic facts to justify the granting of such privilege beyond that generated by the request of such landowner seeking such advantage and the financial advantage ensuing to the Village. Where a general and comprehensive zoning ordinance has been in force for many years and no change has occurred in the subsequent development of the property under the clearly stated classifications, unless the original classification was incompatible with the surrounding circumstances when passed or unless changed conditions require reclassification in the interest of the public good, morals, safety and well being of the people, the legislative authority is without power to arbitrarily downgrade a single parcel in a zoning classification to the disadvantage of the surrounding proprietors as to whose surrounding property the zoning classification remains unchanged.

In the case of *Clifton Hills Realty Co.* v. *City of Cincinnati*, 60 Ohio App., 443, 21 N. E. (2d), 993, the court said in the third paragraph of the syllabus:

"3. A municipal corporation may repeal or amend an existing zoning ordinance, but in doing so it must stay within constitutional limitations which exclude arbitrary and unreasonable action as lacking due process of law."

This case also holds that the declaration in a zoning ordinance amendment, to the effect that the change made in the amendment is in the interest of the people's morals, safety and well being, does not necessarily make it so. Such assertion must be shown by evidence when challenged. The police power exercised by the legislative branch of the Village in passing an original zoning ordinance must have been based on the safety, morals and well being of the people. So that unless conditions have changed so as to require an amendment based on the well being of the people, such assertion in the amendment would be in conflict with the original ordinance.

The appellees rely strongly on the case of *The Cleveland Trust Co.* v. *Village of Brooklyn,* 92 Ohio App., 351, 110 N. E. (2d), 440. This case is clearly distinguishable on the facts and the declarations of law as set out in the opinion which gave a brief history of zoning cases in Ohio. The court said on page 358 of the opinion:

"All zoning laws and regulations must find their justifica-

tion in some aspect of the police power asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delineation. The power to limit industrial establishments to localities separate from residential sections is not to be denied upon the ground that its exercise will divert a flow of industrial development from the course which it would naturally follow and will thereby injure complaining landowners.''

The facts of this case were that the plaintiff as representative owner held title to a vacant tract of land (three parcels) in part abutting the railroad right of way of two railroads and also adjacent to property in the City of Cleveland where the land is zoned for industrial use. The Zoning Ordinance of the Village of Brooklyn, passed in 1940, zoned plaintiff's property, together with other property in the neighborhood, to a Class A or residential use. Upon trial, the Court of Common Pleas held that as to plaintiff's property, the zoning ordinance was confiscatory, illegal and void and ordered the property classified for industrial uses (Class C). The Court of Appeals, in reversing the judgment of the trial court and entering final judgment for the defendant, said:

''Furthermore, the effect of reclassifying plaintiff's property to industrial use would be highly detrimental to, if not destructive of the valuation of other Tiedeman Road property owners who purchased property and built homes relying on the residential character and development of the thoroughfare.''

This statement must have meant the depreciation of a neighborhood as a residential area by the intrusion of industrial activities, thereby challenging the safety and health of the people. The rezoning of the eight acre tract here being considered would have the same effect as here asserted.

The facts in the *Brooklyn case* were that the plaintiff's land was vacant, as was true of other land nearby. The neighborhood, however, had been developed and was being developed as residential. The Appellate Court then said, in entering final judgment for the defendant:

''* * * Up to the present time there have been no changes in the conditions and circumstances surrounding plaintiff's property which would justify judicial interference with the legislative process. * * *''

The *Brooklyn case*, therefore, is just the reverse of the instant case. In that action, the plaintiff sought court interference with the legislative process in declaring an existing zoning ordinance unconstitutional as to plaintiff's property because of the ability of the owner to make a more profitable use of the property as an industrial site and his inability to use it for the purposes for which it was zoned. At a later date, in the case of *Partain* v. *City of Brooklyn,* 101 Ohio App., 279, 133 N. E. (2d), 616, dealing with the same land which had been rezoned for industrial use, upon action of a resident to enjoin the application of the amended ordinance, the prayer of the plaintiff's petition was refused. The refusal was grounded on the situation of the land in that particular case. It is, therefore, clear that the zoning of the property in the *Brooklyn case* was a matter of continuing concern because of its situation. In the instant case, forty years after passing a comprehensive zoning ordinance, the Village Council has attempted to do what the court was asked to do in the first *Brooklyn case,* that is to rezone a single parcel for commercial purposes in the heart of an extensive territory that the legislature had zoned for high class residential use and where, during the intervening years, the territory has developed as planned without a single change or deviation whatever, the undeveloped land being, in part, due to the failure of the Village and other governmental agencies to do their part in providing sanitary sewers.

There is no evidence of changed conditions around or near the property rezoned by the amendment for a regional shopping center and clear proof is presented by the defendants' experts that the property rezoned is unavailable for such use until large sums of money are expended for necessary road improvements, and it is also clearly established that the property is available for use as zoned before the amendment. Therefore, it is our conclusion that upon the undisputed facts, the Village Council of Beachwood abused its discretion in amending the zoning ordinance of the Village (1960-70), whereby the eighty acre tract of land on the east side of Richmond Road between the south roadway of Shaker Boulevard and South Woodland Road was changed from U-1 classification (large lot, single residence purposes) to U-4B classification (regional shopping center

purposes) and for that reason said amendment is null and void and without legal effect.

The second claim of error is also well taken. The act of rezoning a single parcel of land for a single retail purpose, which is situated in the very heart of and surrounded entirely by property zoned for high class, single residences, there being no change or deviation from the zoned classification since the passing of the original zoning ordinance in 1926, and the rezoned property being clearly available (as originally zoned) for use as residence property, constitutes spot zoning.

In McQuillin, Municipal Corporations, 3rd Ed. Revised, Vol. 8, page 187, section 25.83, is found the following statement:

" * * * A singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character for the economic benefit of the owner of that lot or to his economic detriment, is invalid 'spot' zoning. * * *"

In the case of *Page* v. *City of Portland*, 178 Ore., 632, 165 P. (2d), 280, the Supreme Court of Oregon had for consideration facts almost identical with those here being considered. The City of Portland passed a comprehensive zoning ordinance in 1924. On January 28, 1943, a petition of the property owner, seeking a change of zoning for the lots of the petitioner located in the heart of a single family residence zone from Class I (single residence purposes) to Class III (business district) was granted by the Council. The lots comprising a tract of land 100 feet square was as is recited in the opinion: " * * * approximately in the center of an exclusive residential district about one mile in width and two miles in length." The owner proposed to sell the lots to the Safeway Stores, Inc. for retail business purposes. At the same intersection, there were three retail business establishments, all of which were non conforming uses existing prior to the enactment of the comprehensive zoning ordinance. The Supreme Court of Oregon said that an amendatory zoning ordinance which singled out vacant lots in the heart of an exclusive residential district to permit the use of such lots for business purposes was invalid as having no substantial relation to the public welfare and an arbitrary exercise of police power. On page 284 of the opinion as reported in 165 P. (2d), 280, the court said:

"Here, the Council have singled-out these lots in the heart of an exclusive residential district in its prime. The lots—excluding the non-conforming uses above mentioned—are entirely surrounded by the homes of people who desired to get away from the environment of business and industry. If this single intrusion of business is sustained, it will be merely the opening wedge for other commercial interests. It will result in a 'commercial island' established in the center of one of the best residential districts in the City of Portland. We fail to see wherein the change has any substantial relation to the public welfare and therefore it is an arbitrary and unreasonable exercise of the police power. To sustain this amendatory ordinance would frustrate and destroy the purpose and plan of the original comprehensive zoning ordinance enacted in 1924, and under whose protection this district has developed."

In the case of *Mathis* v. *Hannan*, 306 S. W. (2d), 278 (Court of Appeals of Kentucky), the question of the validity of an amendatory zoning ordinance which changes the zoning classification of a parcel of land from R-1 (high type residential) to B-1 (neighborhood business) purposes, was considered. The court held that where the property owners' land had been singled out of a comprehensive plan for zoning in order to permit property owners to construct a shopping center, such amendment conferred special benefits which were not related to the general welfare of the entire community and was detrimental to adjoining landowners who resided around the rezoned area and, therefore, the amendment was invalid. In this case a comprehensive zoning plan had been adopted by the City of Paducah as provided by the state law of Kentucky. The opinion sets out the various zones and describes the land in question as follows:

"* * * West of the railroad the city is devoted almost entirely to residential uses which are designated as one or two-family dwellings. Immediately west of that is the R-1 area, the highest type of residential restriction wherein the 13 acre tract belonging to appellees Hannan is situated. A reference to the map will disclose that the entire Hannan tract is surrounded by property devoted to high type residential purposes. * * *"

In holding the amendatory rezoning ordinance, changing the zoning of the thirteen acre tract zoned for high class residence property to use for a shopping center invalid, the court said on pages 280 and 281 of the opinion reported in 306 S. W. (2d), 278:

"We find nothing in the record indicating that the ground belonging to the Hannans was unsuitable for R-1 residential purposes. There is abundance of proof to the contrary. Its terrain and general characteristics seem to differ little from the adjoining territory which has been rather fully developed by the establishment of high type residences.

"We are well aware of the fact that the legislative action of the governing board must be given great weight so long as it acts within the bounds of the legislative field but this ordinance, like other ordinances, must not be arbitrary or discriminatory. We think the issue in this case, therefore, narrows down to the determination of whether the legislative body arbitrarily spot zoned the Hannan property."

See also *Cassel* v. *Mayor and City Council of Baltimore*, 195 Md., 348, 73 A. (2d), 486; *Borough of Cresskill* v. *Borough of Dumont*, 15 N. J., 238; 104 A. (2d), 441; *Hermann* v. *City of Des Moines*, 97 N. W. (2d), 893 (Supreme Court of Iowa). The facts of the *Hermann case* are that the City of Des Moines passed a comprehensive zoning ordinance on July 9, 1953. All of the property in the block, which included the tract in controversy, was zoned for one and two-family residences. In 1958, the City Council rezoned all of lot 10 except the west 200 feet (situated within "the block" just referred to) for multi-residence purposes. The action was to declare the ordinance void for the reason that it constituted spot zoning. The third headnote provides:

"Where lot, which, together with surrounding property, had been placed in zone restricted to one and two family dwellings under comprehensive zoning ordinance, was similar in character, adaptability, and use, to the surrounding property and had been used as a one family dwelling prior to enactment of amendatory ordinance rezoning such lot, amendatory ordinance was void as an illegal act beyond power of city council, in absence of showing that such rezoning would in any way

promote the public health, morals, safety, or general welfare, and in absence of showing why such lot should be freed of restrictions imposed on surrounding property.''

and on page 897, the court's opinion stated:

''The rules laid down in the *Keller case* are sufficient to require us to hold the amendatory ordinance, No. 5926, is void as being an illegal act beyond the powers of the Des Moines City Council. The same question has arisen in many other jurisdictions, and has had the attention of the text writers, with the uniform holding that zoning authorities may not single out one 'spot' or tract and remove some or all of the restrictions upon it unless some reason appears for the discrimination and the action bears some relation to the public welfare. See Yokley on Zoning Law and Practice, Vol. 1, section 93; 3 McQuillin, Mun. Corp. (Rev.), Section 1048.''

From the facts of the case at bar, as above set out, it is clear that the eighty acre parcel, as was all of the property surrounding it, was originally zoned and is still zoned for high .class (single) residential; that no change or violation of the zoning restrictions has occurred at any place in the Village in the territory of this classification; that the territory has continued to develop for the purposes for which it is zoned insofar as it has been possible, limited only by the failure of the proper public authority to provide sanitary sewers; that the property is (when sewers are available) available (this fact is now a reality) and desirable for the purposes for which it is zoned; that the zoning ordinance, as shown by the overall comprehensive plan, provides areas reasonably accessible within the Village which are zoned for retail business; that there is now adequate shopping close at hand for the citizens of the Village, and that the rezoning of the eighty acres was induced by the proprietors, for the express purpose of building a 'regional' shopping center which, will, if built, bring great numbers of people into the Village for retail shopping purposes in the very heart of its highest class residential area where its streets are now inadequate to provide access to such regional shopping center in safety. (See Sec. 32.01 of the amendatory ordinance hereafter quoted.) Under these undisputed facts, the act of the Village Council in rezoning the eighty acre tract from the highest class, single-family residence purposes down below all the residence

classes, to that permitting a shopping center, constituted spot zoning.

One other fact should receive brief consideration. Zoning ordinances generally are for the purposes of barring undesirable uses from residential areas. Such ordinances "generally operate 'down' rather than 'up,' that is they most often prohibit uses of premises which are less desirable than the use for which the area in which the premises are located is zoned but do not prohibit more desirable uses in such area." (38 A. L. R. (2d), 1141.) The zoning ordinance of the Village of Beachwood, and the particular amendment here being considered, does not prohibit the use of the property zoned for shopping centers from uses above that of shopping centers. The question must have been considered by Council because in Section 6 "Local Business" (page 8 of plaintiff's exhibit 3) provides, in part:

"In Class U-4 or general business districts, no building shall be erected, used or maintained for any uses herein prohibited in Class U-6 use or for any residential use except single family dwelling use unless on special permit issued by the Village Zoning and Planning Commission after public hearing and confirmation by the Council. * * *"

The same exhibit, setting forth Section 32, Class U-4B, District Shopping Center Uses, in part, provides:

"32.01 Intent and Permitted Uses.

"This zone is established in order to provide regulations for area requiring large amounts of land and involving uses generating large volumes of traffic and serving the shopping needs of a large area. General retail business, shops and offices providing services will be permitted in this area except for those uses which are prohibited and designated as Class U-6 uses in this ordinance."

No limitation of higher uses is suggested.

It must, therefore, follow that should a shopping center not be built, the proprietors could proceed to develop two-family houses or multi-family dwellings or even apartment houses within the eighty acre tract so long as the regulations for such development are followed.

For the reasons set out in this opinion, the judgment is reversed and this court, proceeding to enter the judgment which should have been entered by the trial court, enters a decree for

the plaintiff holding said amended ordinance, rezoning the eighty acre parcel at Shaker Boulevard and Richmond Road in said Village void and of no legal effect. The cause is remanded with instructions to give consideration to the question of attorney fees.

KOVACHY, J., concurs.
HURD, J., dissents.

HURD, J., dissenting. It should be clearly stated and emphasized that the property here involved is essentially and peculiarly adapted for a shopping center because it is an expensive tract of eighty acres of undeveloped land bounded by four main highways which effectively divide it from surrounding property.

This eighty acre tract is bounded by Ohio State Route No. 1, a four hundred foot highway on the east; by Shaker Boulevard, a divided highway occupied by two sixty foot road highways and a four hundred foot center strip, on the north; Richmond Road or as it is sometimes known, State Highway Route No. 175, one hundred foot in width, on the west, and South Woodland Road, a one hundred foot in width roadway on the south, all of which highways are a part of and connected with the highway system of Cuyahoga County and the State of Ohio.

This land is entirely vacant and has never been occupied by buildings of any kind. There are no residences near or abutting on this tract. At the corner of Fairmont and Richmond Road there is a substation of the Cleveland Electric Illuminating Company and the Town Hall of the Village (now a City) with accessory buildings, and on Richmond Road, not far from Kinsman Road, there is a telephone substation.

Prior to its enactment, the proposed amendment to the Zoning Ordinance was submitted to and approved by the Regional Planning Commission of Cuyahoga County. The Regional Planning Commission is in effect a county organization. Its representation is composed of citizen members and the three county commissioners, the county engineer, county administrator and representatives of the various municipalities. There are sixty-one municipalities in the county, four of which are town-

ships by reason of which they may not be members of the Commission. At the time of trial, fifty of the fifty-seven municipalities belonged to the Regional Planning Commission which had executive and regular meetings.

The Regional Planning Commission is formed pursuant to state law permitting regional or county planning commissions. According to state law, Section 713.21, Revised Code, the only parties that can belong to the Regional Planning Commission are municipalities that have a planning commission of their own. They, in turn, can send representatives to the Commission. In order to join, they must pay so much per capita. At the time the record in this case was taken, the per capital charge was five cents, a minimum of $100.00 and a maximum of $500.00.

The Regional Planning Commission has a staff, one member of which is a director, staff members who are professional planners, whose background varies in the planning field of economics and sociology, and a secretarial complement. At the time of the hearing, this staff consisted of twenty members. The record also shows that the Village (now a City) of Beachwood is a member of this Regional Planning Commission. Melvin Roebuck, who testified on behalf of the Village of Beachwood, is a member of the American Institute of Planners, the American Society of Planning Officials, and prior to his employment with the Regional Planning Commission, he was employed in the State of New York by two different agencies, one of which was for private consultants and the other was for the City of New York in the Department of City Planning. Mr. Roebuck had been with the Regional Planning Commission here in Cleveland almost eight years. For three years before the time of trial, he had been the representative from the Commission to the Village of Beachwood.

The Regional Planning Commission made a very careful study of the proposed shopping center and took into consideration the other shopping centers in the areas outside the Village of Beachwood and recommended the eighty acres as a desirable location for a shopping center for the City of Beachwood. In addition, the Planning and Zoning Commission of Beachwood made a study of the proposed shopping center and unanimously recommended adoption thereof by the Council. The

record shows that the members of the Planning and Zoning Commission of Beachwood are appointed from various sections of the City as provided by Article VII, Section 2, of the Charter of Beachwood. The record also shows that the two members of Council who live in the neighborhood of the eighty acre tract voted, after due and careful deliberation, with the remaining members of Council, to change this tract to a shopping center use. These two council members, along with Councilman Hopwood, a former Acting Mayor of Beachwood, testified that in their opinion the shopping center was needed for the welfare of the City and also would increase the value of their property.

While the original Zoning Ordinance was first adopted as an emergency measure, the amendatory ordinance in question was enacted without an emergency provision, thereby permitting any persons feeling aggrieved to conduct a referendum. However, the two appellants were not interested enough to promote a referendum. Neither was a referendum attempted by anyone else and the legislation stands unchallenged except by the present appellants in this suit.

While this is an appeal on questions of law, there are no assignments of error but merely arguments against the proposed legislation on the ground that the trial court abused its discretion. The trial court found in favor of the legislation in a very able opinion, *Willott et al, v. Village of Beachwood,* 87 Ohio Law Abs., 143, 176 N. E. (2d), 337, which is hereby adopted as part of this dissenting opinion. It is not claimed that the judgment is contrary to the manifest weight of the evidence or that the trial judge committed any error prejudicial to plaintiffs in the course of the trial.

The following, which appears as part of the trial court's opinion, is an apt and objective description of the use to be made of this property:

"In 'Beachwood Park,' as the project is called, Proponents propose to establish a large, beautiful, mall-type, integral, high-class, regional shopping center with a variety and quality of merchandise not now available. This is not just another shopping center. As plaintiff's own exhibit (No. 8) shows, it is:

" ' '* * * designed to be a handsome addition to the community, its appearance suggesting a campus or park rather than a conventional shopping center. To achieve this appearance,

the following factors have been incorporated in the design—factors which make Beachwood Park uniquely attractive to the high-grade community which it will serve:

" '1. A planting belt of at least sixty feet total depth separates Beachwood Park from all surrounding roads, and islands of large existing trees are preserved and beautified as green shady areas throughout the project.

" '2. Signs at the entrances to Beachwood Park are small and dignified, park-like in design. The usual flashing neon signs are not considered as part of the visible exterior views of this development. They will be replaced by coordinated-design vertical markers at each pedestrian entrance to the Mall.

" '3. Buildings, set back at a great distance from all roads, are designed to be low and harmonious with the residential architecture of the neighborhood, being of red brick and white trim, of small size and domestic scale, and surrounded by green terraces, lawns, and planting.' "

It must be observed that in the ordinary sense of the term this is not just an ordinary shopping center but one designed and well-fiitted for this particular territory.

There is substantial evidence in the record, including expert testimony, that the shopping center would not depreciate the market value of any residential property surrounding this area; that there is a fall of between forty to sixty feet in the topography of the eighty acres extending east from Richmond Road to the eastern boundary line of the eighty acre tract; that due to this fall and a high north and south elevation of land about eight hundred to one thousand feet to the west of the eighty acres, running for a distance to the central portion of the Village, the properties to the west of the ridge would be screened from any view of the shopping center. Moreover, the wide north and south roads of Shaker Boulevard and its center strip, the one hundred foot width of South Woodland Road and the four hundred foot width of the freeway to the east abutting the eighty acres, would isolate the shopping center from the surrounding residential properties so as to afford a benefit rather than a detriment.

Applying the law to the facts of the instant case, we cite *Cleveland Trust Co.* v. *Village of Brooklyn*, 92 Ohio App., 351,

110 N. E. (2d), 440 (motion to certify overruled—appeal dismissed 158 Ohio St., 258, 108 N. E. [2d], 679), paragraphs one, two and five of the syllabus providing as follows:

"1. All zoning laws and regulations must find their justification in some aspect of the police power asserted for the public welfare. Such laws and regulations must be considered as a valid exercise of police power if substantially related to public health, safety, morals or welfare.

"2. The power of a municipality to establish zones and to classify property accordingly, is purely a legislative function which will not be interfered with by the courts, unless such power is exercised in an arbitrary, confiscatory and unreasonable manner in violation of constitutional guarantees.

"5. Since the value of all property in zoned areas must be considered in relation to public health, safety, morals or welfare, the fact that a portion of an area zoned for residential uses would be more valuable if zoned for industrial uses does not in and of itself render the zoning regulation unconstitutional or invalid."

In *Partain* v. *City of Brooklyn*, 101 Ohio App., 279, 133 N. E. (2d), 616, decided March 22, 1956, the Council of the Village of Brooklyn amended the Zoning Ordinance to permit a manufacturing plant to be built on the property which was involved in the case of *Cleveland Trust Co.* v. *Brooklyn, supra.* In sustaining the Court of Common Pleas (Blythin, J.) this court held as appears by paragraphs one, two and three of the syllabus:

"1. The legislative function of a municipality in establishing zones and classifying property accordingly will not be interfered with by the courts unless such power is exercised in an arbitrary, confiscatory and unreasonable manner in violation of constitutional guarantees.

"2. Facts necessary to justify judicial interference with the sound discretion of a legislative body in enacting a municipal zoning ordinance must clearly appear from the evidence and, if debatable, the legislation will be upheld.

"3. Where a parcel of real estate comprising 61 acres of land in the city of Brooklyn (immediately contiguous to a 31-acre parcel of land within the city of Cleveland which is now

zoned and has always been zoned for industrial uses), the Brooklyn property being located north of the New York Central Belt Line Railroad and abutting on the west side of Tiedeman Road, is rezoned from dwelling house to industrial use, held such rezoning is not an arbitrary use of police power unrelated to the protection of public health, morals, safety and general welfare of the people, and, therefore, this court is without authority to nullify such legislation by judicial decree.''

In the case of *Curtiss* v. *City of Cleveland,* 166 Ohio St., 509, 144 N. E. (2d), 177, the Supreme Court, reversing this court, stated, in the concluding paragraph of its opinion at page 529, as follows:

''Since, however, the Court of Appeals as shown herein found as a matter of law that those, who had expended capital in acquiring and substantially improving lands for 'retail business' in reliance upon and in conformity with the zoning ordinance in effect prior to these amendatory ordinances, were, because of the circumstances and conditions created at the affected locations by reason of such improvements, entitled to rely upon the continuance of such prior ordinance without amendments materially increasing restrictions upon the use of their property, and entered its judgment accordingly, the judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.''

The facts of that case are obviously applicable to the instant case where there is a statement in the majority opinion to the effect that the rezoning of the tract here involved is such a departure from present zoning that it cannot be sustained. Paragraph two of the syllabus of the *Curtiss case* reads:

''2. Actual or potential loss in value resulting from the rezoning of substantially improved lands does not of itself render an amendatory zoning ordinance invalid; and owners of such lands have no constitutional right to rely upon the provisions of an original comprehensive municipal zoning ordinance so as to permanently impair or prevent the adoption of a subsequent amendatory ordinance. However, if when applied to the owners of such lands such ordinance is found to be unreasonable, and discriminatory, and without relation to the public health, safety, morals or general welfare, injunctive relief will lie.''

Considering these cases and applying them to the facts of the instant case, the Council, on recommendation of the Regional Planning Commission of Cuyahoga County and the Planning and Zoning Commission of the Village, voted unanimously for the change in zoning. In view of the facts of these cases and the facts in the instant case, we can only conclude that the zoning change was a lawful exercise of authority and that such action did not constitute an arbitrary use of the police power unrelated to the public health, morals, safety and general welfare of the people of Beachwood.

I have examined the cases cited in the majority opinion and find none applicable to the facts of the case at bar.

For instance, in the case of *Hermann* v. *City of Des Moines*, 97 N. W. (2d), 893, there was involved a portion of a lot 87 x 200 feet, which was in effect an island in a sea of higher uses. The court in that case rightly held that the amendment concerning this could not stand; that the ordinance was void as an illegal act in the absence of a showing that the rezoning would in any way promote the public health, morals, safety and general welfare. The size of the lot will show readily that that case does not have any application to the instant case.

In *Page* v. *City of Portland*, 178 Ore., 632, 165 P. (2d), 280, relied upon in the majority opinion, there was involved a tract of land one hundred feet square which was rezoned from a single residence to a business district. Such rezoning of this small tract of land was set aside as having no substantial relation to the public health, welfare and morals. Obviously this case has no application to the instant case.

In *Cassell* v. *Mayor & City Council of Baltimore*, 195 Mo., 348, 73 A. (2d), 486, there was involved again a single lot in a residence district. The court held that this was invalid as spot zoning.

In *Mathis* v. *Hannan*, 306 S. W. (2d), 278, a thirteen acre tract was involved. This was held to be spot zoning inasmuch as the tract was in a high-type residential district devoted entirely to residential purposes, the court saying "We cannot arbitrarily say that a 50 foot lot is small and a 13 or 14 acre tract is not small. Each must be related to its surroundings." It was there held that where property owners' land had been

singled out of comprehensive plan for zoning, in order to permit property owners to construct shopping center, amendment to ordinance conferred special benefits which were not related to general welfare of entire community, and was detrimental to adjoining landowners who resided around rezoned area, and therefore, amendment was invalid. The difference between that case and the instant case is obvious as eighty acres are here involved separated effectively from surrounding areas by the highways hereinbefore described.

In *Borough of Cresskill* v. *Borough of Dumont,* 15 N. J., 238, 104 A. (2d), 441, an attempt was made to change one block from a residential zone to a business district. The block is 787 feet in length and 195 feet in width. The contiguous area was residential except for some nonconforming uses. In this case there were also several small business districts nearby and one shopping center one-half mile away. It was held that the proposed change did not promote any of the statutory purposes relating to zoning and the amendment which granted a zoning change was set aside.

In *Clifton Hills Realty Co.* v. *City of Cincinnati,* 60 Ohio App., 443, 21 N. E. (2d), 993, decided March 28, 1938, cited in the majority opinion as being analogous to the instant case, we have a forty acre area involved. It was proposed to erect on said forty acres immediately adjacent to a strictly residential area ninety two apartment houses of the unit type, each unit to be constructed so as to accommodate eight or more families and in addition, to erect thereon a two-story public garage to house 280 automobiles where automobiles of the tenants or other persons (not tenants) would be washed, serviced or provided with fuel and oil. In that case, the plaintiff and defendant acquired the property, consisting of thirty and forty acres respectively, in 1937 and at the time both properties were zoned as "Residence B" properties. Thereafter, while both properties were still zoned as "Residence B" properties, the plaintiff subdivided its land into approximately sixty five lots, laid out and built streets and sold many lots under a general plan, restricting their use to single family residences. The plaintiff and its grantees had expended more than one million dollars in developing the property. The plan of the defendant to

develop the forty acres immediately adjacent with the type of construction heretofore described obviously would be an infringement upon the rights of the plaintiff in connection with the residential development of its property, consequently, the facts of that case are not here applicable.

The majority opinion cites from Section 25.83, McQuillin on Municipal Corporations, Volume 8, from a paragraph entitled "Island," "spot," and haphazard zoning, as follows:

"A singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment, is invalid 'spot' zoning."

Involved in this quotation is one lot or a small area which is singled out for different treatment from that given surrounding property. Obviously this quotation has no application to the instant case.

This concludes an analysis of the cases cited in the majority opinion.

The following case and text authorities are more directly in point.

In *Pecora* v. *Zoning Commission of Town of Trumbull*, 145 Conn., 435, 144 A. (2d), 48, a rezoning from residential to commercial use of 60 acre tract fronting on major highway to permit development as regional shopping center was valid.

In McQuillin on Municipal Corporations, Volume 8, Section 25.281, commencing at page 694, the following text is clearly applicable to the facts of the instant case:

"In cases of *doubtful or debatable reasonableness or validity, courts will and must sustain zoning ordinances and administrative action thereunder.* This compulsion of the courts thus to treat zoning as valid although its validity may appear doubtful can be based on, or is closely related to, various fundamental legal rules and principles, including the following: Under constitutional separation of powers courts must strictly restrain themselves from substituting their judgment for that of zoning authorities as to the necessity, extent and propriety of zoning; the validity of ordinances is favored and presumed, this being true of zoning ordinances; ordinances will if possible be construed as valid; and the burden of proof is on one

who asserts the invalidity of an ordinance, this rule likewise being applicable to zoning ordinances. Accordingly, where the relationship of zoning to the public health, safety, morals, welfare, or other object of the police power is fairly debatable, ordinarily the courts will not interfere therewith. That is to say, if reasonable minds differ as to whether a zoning restriction has a substantial relation to one of these fundamental purposes of the police power and of zoning, the restriction must stand as a valid exercise of the police power.'' (Emphasis added.)

Citing in support of the text are the Ohio cases of *Miesz* v. *Village of Mayfield Heights*, 92 Ohio App., 471, 111 N. E. (2d), 20; *Cleveland Trust Co.* v. *Village of Brooklyn, supra.* The cases cited generally include decisions of the United States Supreme Court and of state courts from Alabama to Texas.

Also, in McQuillin on Municipal Corporations, Volume 8, Section 23.282, we find the following:

''It is repeatedly said by the courts that the reasonableness and validity of each zoning case must be determined upon its own facts and circumstances.''

In the instant case, the trial judge had the benefit of hearing the witnesses at first hand and after a very careful and well reasoned opinion, came to the conclusion that the zoning of the instant property for business purposes was valid in all respects. The court considered at great length the claims of appellants concerning restrictions and correctly held against appellants' claims. In *Willott et al,* v. *Village of Beachwood, supra,* at page 153 of 87 Ohio Law Abstract, the court stated:

''In a factional zoning fight, the court's power is extremely limited. There is a popular misconception about it. Irked citizens often think that a court can upset council's action merely because there are good talking points against it. Nothing is farther from the truth. The court cannot usurp. The functions of court and council are distinct and mutually exclusive. Just because a court is a court does not give it the power to de-enact anymore than to enact a zoning ordinance. Council represents the people. When it speaks, presumably it is the will of the people. * * *

''The only and limited question that the court can determine is whether the reasonableness of council's action is *fairly debatable. If it is fairly debatable, then it is valid and a court*

*cannot interfere.* If it is not fairly debatable, then a court will declare it invalid. 3 Metzenbaum, 1826-42, reviews many cases, but the essence is distilled at page 1826:

" 'Courts will not measure their judgment over against that of the legislative branch, as to expediency, advisability or wisdom of "Police Power" legislation, unless there is plainly and palpably no relation between the legislation—on the one hand—and the public welfare, on the other hand. The illegality must be plain, apparent and beyond debate, before courts are justified in declaring "police power" legislation to be invalid or unconstitutional.' " (Emphasis added.)

For the reasons stated, the judgment of the trial court should be affirmed.